United States District Court
Southern District of Texas
**ENTERED**
March 12, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Leon Miller, | § § § |
| *Plaintiff,* | § § § Case No. 4:22-cv-03905 |
| v. | § § |
| Kilolo Kijakazi[1] Acting Commissioner of Social Security, | § § § § § |
| *Defendant.* | § § |

# MEMORANDUM AND ORDER

This is an appeal from an administrative ruling denying disability benefits. The case was transferred to the undersigned judge upon consent of the parties. Dkt. 21. After carefully considering the parties' briefs, Dkt. 11, 16, 17, the administrative record, Dkt. 8, and the applicable law, the Court reverses the decision of the Social Security Administration and orders that disability benefits be awarded to Plaintiff Leon Miller.

## Background

Miller filed for social security benefits under Title II on December 2, 2019, claiming a disability onset date of November 22, 2019. R.219.

---

[1] Although Martin O'Malley became the Commissioner of Social Security on December 20, 2023, no request to substitute him as Defendant has been filed.

Previously, Miller worked as a materials manager, assistant materials manager, and stock clerk. R. 260-63. Miller was a member of the U.S. military from 1980 to 1983. R.219. He has a 100% disability rating from the U.S. Department of Veterans Affairs for major depressive and anxiety disorder. R.217. In his application before the Social Security Administration, Miller claimed he suffered from gross anxiety, gross depression, and tinnitus. R.244.

The Commissioner denied Miller's application for benefits, initially and upon reconsideration. R.80-101, 102-112. Miller requested a hearing before an administrative law judge (ALJ). R.129. After the hearing, the ALJ issued a decision determining that Miller is not disabled. R.25-39.

The ALJ found that Miller had the following severe impairments: major depressive disorder, unspecified anxiety disorder, headaches, and tinnitus. R.30. The ALJ next concluded that these impairments do not meet the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. R.31. The ALJ did not find a relevant listing for tinnitus but did consider Miller's headaches under Listing 11.02, finding no medical equivalence. *Id*. As for Miller's mental impairments, the ALJ concluded that Miller has only a "moderate limitation" under all four Paragraph B categories: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. R.32.

The ALJ then turned to formulating Miller's residual functional capacity (RFC), concluding that Miller can:

> perform a full range of work at all exertional levels but with the following non-exertional limitations: The claimant can never climb ladders, ropes, and scaffolds. He can never work around hazards such as exposed heights and moving machinery. He is able to work in an environment with a moderate noise intensity level such as would be found in department and grocery stores, light traffic, or office settings. He can understand, remember, and carry out simple, routine tasks; and he can tolerate occasional interaction with supervisors, co-workers, and the public.

R.33.

As for Miller's prior work, the ALJ only considered Miller's past position as a stock clerk. R.37. This position is semi-skilled with an SVP rating of four. *Id.* Based on the RFC, the ALJ determined that Miller can only perform unskilled work, which excludes his past relevant work. *Id.*

Lastly, the ALJ determined whether Miller's RFC precluded him from performing jobs available in the national economy. R.38-39. At the hearing, the vocational expert (VE) identified only three positions that a hypothetical person with Miller's limitations could perform: floor waxer, store laborer, and caretaker. R.75-76. On cross-examination, however, the VE also testified that all three positions require training periods of longer than two and a half hours. R.77. Because of that requirement, the VE agreed that a hypothetical person of Miller's age, education, and work experience who was also restricted to

occasional interaction with supervisors, co-workers, and the public, could not complete the mandatory training for those three positions. *Id.*

The ALJ's opinion did not address the VE's testimony indicating that Miller would be unable to complete the necessary training for the jobs identified by the VE. *See* R.38-39. Nonetheless, the ALJ concluded that Miller could work as a floor waxer, store laborer, or caretaker, such that he did not qualify as disabled. *Id.*

Miller appealed the ALJ's determination to the Social Security Appeals Council, which denied review. R.13. This appeal followed. Dkt. 1.

## **Legal standard**

A reviewing court assesses the Commissioner's denial of social security benefits "only to ascertain whether (1) the final decision is supported by substantial evidence and (2) whether the Commissioner used the proper legal standards to evaluate the evidence." *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016) (per curiam) (internal quotation marks omitted). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion.'" *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is "more than a scintilla, but it need not be a preponderance." *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012) (per curiam) (internal quotation marks omitted).

When conducting its review, the Court cannot reweigh the evidence or substitute its judgment for the Commissioner's. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). "Conflicts of evidence are for the Commissioner, not the courts, to resolve." *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). But judicial review must not be "so obsequious as to be meaningless." *Brown*, 192 F.3d at 496 (internal quotation marks omitted). The court must scrutinize the record as a whole, taking into account whatever fairly detracts from the weight of evidence supporting the Commissioner's findings. *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986).

## Analysis

### I. Legal framework

"The Commissioner uses a sequential, five-step approach to determine whether a claimant is … disabled: (1) whether the claimant is presently performing substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from performing any other substantial gainful activity." *Morgan v. Colvin*, 803 F.3d 773, 776 (5th Cir. 2015) (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)) (footnote omitted). Before moving from step three to four, the ALJ determines the

5

claimant's RFC, which is used to evaluate steps four and five. *Id.* at 776 n.2 (quoting § 416.1520(a)(4)).

"Under this five-step approach, if the Commissioner determines at a prior step that the applicant is or is not disabled, the evaluation process stops ...." *Id.* at 776 (citing § 416.1520(a)(4)). The claimant bears the burden of proof at the first four steps. *Kneeland v. Berryhill*, 850 F.3d 749, 753 (5th Cir. 2017). At the fifth step, the burden of proof shifts to the Commissioner "to establish the existence of other available substantial gainful employment that a claimant can perform." *Id.* at 753-54. The Commissioner fulfills this burden by identifying potential alternative employment that exists in significant numbers in the national economy. *See Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987); 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1566(a). The burden then "shifts back to the claimant to prove that he is unable to perform the alternate work." *Fraga*, 810 F.2d at 1302.

II. **Any errors at step three concerning Miller's primary headache disorder were harmless.**

At step two, the ALJ determined that Miller's diagnosed cluster headaches qualify as a medically determinable impairment. R.30. But at step three, the ALJ determined that Miller's headaches did not meet or medically equal the severity of a listed impairment. *Id.*

6

Cluster headaches are classified as primary headache disorders. SSR 19-4p, 2019 WL 4169635, at *2 (Aug. 26, 2019). While there is no direct listing for primary headache disorders, SSR 19-4p directs ALJs to evaluate medical equivalence under Listing 11.02, specifically Paragraph B or D.[2] *Id.* at *7.

Here, the ALJ considered Listing 11.02, but did so without explicitly addressing the guidance in SSR 19-4p. *See* R.31. That guidance directs ALJs to "consider[] [a] detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena … ; the frequency of headache events; adherence to prescribed treatment; side effects of treatment … ; and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment …." SSR 19-4p at *7.

Miller argues that the ALJ violated SSR 19-4p by failing to consider two of the listed categories of information, namely the frequency of Miller's headache events and his adherence to prescribed treatment. Dkt. 11 at 15-16; SSR 19-4p at *7. But even if that were true, the error was not prejudicial because substantial evidence supports the conclusion that Miller's headaches

---

[2] The Court interprets Miller's argument solely as a Listing 11.02B challenge. Listing 11.02D requires a marked limitation in physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.02D. The ALJ did not find a marked limitation in any of these categories, and Miller has not challenged that result. *See* R.32; *see also infra* Part II. The relevant inquiry, therefore, is whether Miller's primary headache disorder medically equals Listing 11.02B.

neither meet nor medically equal this listing. *See Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (per curiam) ("To establish prejudice, a claimant must show that he 'could and would have adduced evidence that might have altered the result.'") (quoting *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)).

Under SSR 19-4p, the "signs and limitations" of a primary headache disorder must be "equivalent" to Listing 11.02B. *See* SSR 19-4p at *7. Listing 11.02B, in turn, requires episodes to occur "at least once a week for at least 3 consecutive months *despite adherence to prescribed treatment.*" *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 11.02B (emphasis added).[3] Thus, Listing 11.02B largely dovetails with SSR 19-4p in that both examine the frequency of a claimant's headaches despite taking medication.

As Miller notes, the ALJ's analysis did not cite medical findings regarding the frequency of Miller's headaches nor his adherence to prescribed treatment. *See* Dkt. 11 at 15-16; R.31. The ALJ recognized that Miller testified about experiencing headaches 2-3 times per week. R.31. But the ALJ noted

---

[3] Miller also argues that the ALJ misquoted Listing 11.02B. Dkt. 11 at 14. The ALJ stated that Listing 11.02 "requires an episode to occur more frequently than once weekly in spite of at least three months of prescribed treatment." R.31. The ALJ also described Listing 11.02 as requiring "transient postictal manifestations of unconventional behavior or significant interference with activity during the day." R.31. Listing 11.02 does not include either of these requirements. The Commissioner acknowledges these misstatements, but asserts they are harmless. Dkt. 16 at 8. The Court agrees with the Commissioner because substantial evidence addressed below supports the ALJ's conclusion that Miller's headaches neither meet nor medically equal Listing 11.02.

8

that the record contains no corroborating imaging or headache journals. *Id.* The ALJ concluded the objective evidence did not support a finding the headaches meet or medically equal Listing 11.02B. *Id.* That portion of the ALJ's opinion did not address the effectiveness of Miller's prescription medications or the medical records discussing his headache episodes.[4]

In this appeal, however, Miller identifies no medical evidence substantiating the frequency of his headaches. He cites a single record noting his migraines, but without addressing their frequency. *See* Dkt. 11 at 16 (citing R.595). If anything, that record indicates Miller's headaches do not occur at regular intervals. *See* R.595 ("[H]e often feels anxious wondering when the next debiliating [sic] pain attack will come.").

As the Commissioner observes, Miller's further references to his own testimony do not constitute the necessary evidence "from an acceptable medical source." *See* Dkt. 16 at 8-9; Dkt. 11 at 16; *see also* SSR 19-4p at *2 (to medically equal a listing for a primary headache disorder, a claimant must show "objective medical evidence from an acceptable source" and cannot be

---

[4] In connection with the RFC, the ALJ did note medical records confirming Miller's diagnosis of cluster headaches. R.34 (citing R.358). He acknowledged that Miller was prescribed ibuprofen and meclizine for headaches, R.35 (citing R.876), and found that Miller's claimed side effects were inconsistent with the medical record, R.36 (citing R.345, 380, 418, 641, 878). As for the frequency of Miller's headaches, the ALJ found that while some records indicate weekly headaches, R.35 (citing R.358, 397), others report no headache occurrence, *id.* (citing R.907, 963).

9

"based on a person's statement of symptoms alone"); *Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir. 1988) (per curiam) (ALJ properly discounted claimant's testimony that was inconsistent with objective evidence). This omission alone shows that any errors in the ALJ's analysis were harmless.

Moreover, substantial evidence supports the ALJ's ultimate conclusion that Miller's condition does not meet or equal Listing 11.02B. As the medical record reflects, Miller's headaches reduced significantly when he took his prescribed medication. For example, in 2018, Miller reported that his headaches only occurred "once a month or so" and that his prescribed sumatriptan "helps." R.508, 528. Contrast that with 2019, when Miller stopped taking headache medication and reported his headaches occurred "2-3x per week lasting 3 hours at a time." R.358, 551. During that time, his doctor prescribed meclizine and ibuprofen. R.391, 407, 580. A few months later he was also prescribed duloxetine. R.333, 346, 390. Miller continued taking those medications in 2020 and reported that "duloxetine is somewhat effective for headache." R.706, 878. Doctors also reported "[n]o seizures, tremors or headaches" during this time. R.621, 907. And in 2022, Miller was "[n]egative for seizures, faints, headache, numbness, limb weakness." R. 965. Objective evidence therefore shows that Miller's adherence to his medication regimen reduced his headache episodes to fewer than once a week.

Notably too, SSR 19-4p explains that it is "uncommon" for headache disorders to medically equal Listing 11.02. *See* SSR 19-4p at *7. This record counsels against such an "uncommon" finding, given the apparent effectiveness of Miller's medications and the lack of countervailing evidence from an acceptable medical source. Accordingly, the ALJ's failure to cite medical evidence pursuant to the SSR 19-4p guidelines was harmless.

### III. Substantial evidence supports the limitations prescribed in the RFC, and thus the related hypothetical posed to the VE.

Miller also challenges the formulation of his RFC. *See* Dkt. 11 at 17-20. Before step four in the disability evaluation process, an ALJ must determine a claimant's RFC—the "most the claimant can still do despite his physical and mental limitations." *Perez*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)). When forming the RFC, "an ALJ must perform a function-by-function assessment of a claimant's capacity to perform sustained work-related physical and mental activities." *Beck v. Barnhart*, 205 F. App'x 207, 213 (5th Cir. 2006) (per curiam).

"The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is not a list of mental impairments, but an assessment of how those impairments impact a claimant's "ability to meet the physical, mental, sensory, and other

11

requirements of work." *See* 20 C.F.R. § 404.1545(a)(4); *see also id.* § 404.1545(c) ("When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis.").

Here, the RFC accounts for Miller's mental limitations by imposing relevant restrictions on Miller's ability to work. *See* R.33 ("He can understand, remember, and carry out simple, routine tasks; and he can tolerate occasional interaction with supervisors, co-workers, and the public."). Miller asserts, however, that the ALJ's failure to include his moderate limitations in the "domain" of "adapting and managing"—which the ALJ found at step three, when analyzing the Paragraph B requirements—is reversible error. Dkt. 11 at 19. The Commissioner responds that nothing required the ALJ to include such a finding in an RFC. Dkt. 16 at 12. The Commissioner is correct.

Tellingly, Miller cites no authority suggesting that an ALJ must incorporate Paragraph B findings in the RFC. Quite the contrary, SSR 96-8p instructs that findings on Paragraph B criteria "are not an RFC assessment." 1996 WL 374184, at * 4. Likewise, courts recognize that Paragraph B findings, while relevant, "do not require the use of any particular language" when formulating the RFC. *See Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 209 (3d Cir. 2019); *see also, e.g.*, *Elizondo v. Kijakazi*, 2023 WL 3214598, at *4 (W.D. Tex. May 1, 2023), *adopted by* 2023 WL 3514460 (W.D. Tex. May 17, 2023);

*Jones v. Comm'r of Soc. Sec.*, 2023 WL 6049594, at *4 (S.D. Tex. Sept. 15, 2023) (rejecting notion that an RFC must account for moderate limitations associated with Paragraph B criteria).

Here, the ALJ properly evaluated Miller's mental limitations when crafting the RFC, including his moderate issues with adapting and managing himself. The ALJ considered Miller's difficulty with regular hygiene, suicidal ideations, and general depression symptoms, including PHQ-9 scores. R.34-35. But the ALJ concluded that Miller's asserted symptoms were not entirely consistent with other record evidence. *See* R.35.

For instance, although Miller testified that he showers once every three weeks, R.73, he previously reported bathing "once a week," R.587. As for Miller's depression, medical records indicate that Miller has no plans or intent for self-harm and he has never attempted suicide. *See* R.587, 600, 606, 890; *see also* R.515 (treating psychiatrist assessing Miller's risk of imminent self-harm as "LOW"). A 2019 assessment also noted that Miller had "good self-care," no suicidal ideations, fair insight, and fair to good judgment. R.348. And even Miller's PHQ-9 scores, which evaluate depression, fluctuated over time. *See* R.493 (2018 score of 7, indicating mild depression); R.600 (January 2020 score of 12, moderate depression); R.840 (March 2020 score of 21, severe depressive symptoms); R.666 (July 2020 score of 25, severe depressive symptoms); R.756 (2021 score of 9, mild depression).

13

Given this record, the ALJ properly found that Miller's depression symptoms warranted some reductions to his RFC—namely a limitation to simple, routine tasks and occasional interaction with supervisors, co-workers, and the public. R.35. Miller cannot show that the ALJ erred by declining to include greater restrictions. *See Elizondo*, 2023 WL 3214598, at *6 (concluding that similar RFC limitations "adequately incorporated moderate limitations in the functional area of adapting or managing oneself").

The substantial evidence supporting the RFC defeats Miller's interrelated challenge to the hypothetical posed to the vocational expert (VE). "[A] hypothetical is deemed to have 'incorporate[d] reasonably' the claimant's disabilities recognized by the ALJ where the hypothetical question 'tracks' the RFC." *Brown v. Saul*, 2020 WL 1166270, at *4 (S.D. Tex. Mar. 11, 2020) (quoting *Boyd v. Colvin*, 2016 WL 11431548, at *20 (N.D. Tex. Mar. 28, 2016)), *adopted by* 2016 WL 1578767 (N.D. Tex. Apr. 19, 2016)). In this case, the proffered hypothetical tracked the RFC. *Compare* R.33 *with* R. 74-75. Neither the hypothetical nor the RFC provides a basis for reversal.

### IV. The ALJ's failure to account for Miller's inability to complete training for the jobs identified by the VE warrants reversal.

The VE's testimony does, however, highlight a different error in the ALJ's analysis. When an ALJ "correctly describe[s] [the claimant's] limitations to the vocational expert," the Court "should accord weight to his testimony."

14

*See Pineda v. Astrue*, 289 F. App'x 710, 714 (5th Cir. 2008) (per curiam). Despite crediting the VE's opinion about the jobs available to someone with Miller's functional limitations, the ALJ did not consider the VE's further testimony that Miller could not complete a mandatory training period for those jobs. *See* R.38. This was reversible error.

At the hearing, the VE testified that a person with Miller's limitations could perform the jobs of floor waxer, store laborer, or caretaker. R.74-76. But on cross-examination, the VE explained that someone limited to occasional interaction with others could not be trained to perform those jobs. *See* R.77 ("Q: So if they were limited to occasional interaction, completely limited, they could not be trained for those positions? A: Correct.").

Miller does not dispute that he could perform the day-to-day responsibilities of those positions. Instead, Miller argues that the ALJ failed to consider his inability to complete the mandatory training associated with those positions, due to his limitation on interacting only occasionally with supervisors, co-workers, and the public. *See* Dkt. 11 at 10-12 (discussing R.33); Dkt. 17 at 1-2 (same). The Commissioner responds that whether Miller can complete the mandatory training period is irrelevant because Miller can perform the job itself on a "regular and sustained basis." Dkt. 16 at 5 (quoting SSR 96-8p, 1996 WL 374184, at *1).

15

SSR 96-8p states that "[o]rdinarily, RFC is an assessment of an individual's ability ... on a regular and continuing basis." 1996 WL 374184, at *1. This begs the question of whether a claimant's inability to satisfy a prerequisite to performing the job "on a regular and continuing basis" renders that job unavailable.

Although the Fifth Circuit has not explicitly resolved the question, another court of appeals has. In *Sczepanski v. Saul*, the Second Circuit reversed a decision upholding the Commissioner's denial of benefits because the unskilled jobs identified by the VE permitted no absences during an initial probationary period, whereas the claimant's RFC contemplated her being absent once a month. *See* 946 F.3d 152, 155-56, 158-59, 161 (2d Cir. 2020). The court rejected the Commissioner's contention that disability determinations do not account for "impediments to working that do not reflect an inability to perform the functional demands of a job." *Id.* at 159-60 (quoting Commissioner's contention). Rather, the court reasoned, "[t]he ability to complete a probationary period is thus tantamount to the ability to keep a job, and as multiple circuits have recognized, the ability to keep a job is a necessary prerequisite to the ability to engage in substantial gainful activity." *Id.* at 159 (collecting and analyzing authorities).

Notably, the *Sczepanski* court also cited *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986), for the principle that "the ability to keep a job is a

16

necessary prerequisite to the ability to engage in substantial gainful activity." *Sczepanski*, 946 F.3d at 159 n.8. In *Singletary*, the Fifth Circuit explained that whether a claimant can engage in substantial gainful activity depends on "more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time." 798 F.2d at 822.

The Court finds *Sczepanski*'s reasoning persuasive and dispositive here. Like a probationary period, a mandatory training period generally comprises "the first phase of a job, after an employee has been hired, but before []he has attained permanent employee status." *See Sczepanski*, 946 F.3d at 159. The ability to complete mandatory training is therefore "tantamount to the ability to keep a job." *See id.* And given that a claimant must be able to "*hold* whatever job he finds," *Singletary*, 798 F.2d at 822, his inability to complete a required training period renders him unable to perform the job.[5]

---

[5] This conclusion comports with decisions from this Court recognizing, albeit in dicta, that "the ability to perform the work is meaningless if a prospective employee could never complete the necessary training." *Lara v. Berryhill,* 2017 WL 7790109, at *9 (S.D. Tex. Dec. 4, 2017), *adopted by* 2018 WL 1027764 (S.D. Tex. Feb. 21, 2018); *see also Treadaway v. Berryhill*, 2018 WL 3862106, at *5 (S.D. Tex. Aug. 13, 2018) ("The vocational expert's consideration of job training and a probationary work period was inherent in her assessment of jobs Plaintiff could perform with her limitations.").

17

In this case, the RFC limits Miller to occasional interaction with others. R.33. As the VE agreed, that limitation precludes Miller from completing the training period necessary to hold the positions of floor waxer, store laborer, and caretaker. R.77. Under *Sczepanski* and *Singletary*, the ALJ therefore erred in concluding that Miller can perform these jobs. And this error was prejudicial because the VE identified no other relevant jobs that Miller could perform.

These conclusions merit reversal and an award of benefits to Miller, as he requests. *See* Dkt. 11 at 12 (requesting award of benefits); Dkt. 17 at 5 (same). District courts have the authority to direct the Commissioner to award benefits "where the record enables the court to 'determine definitively that the claimant is entitled to benefits.'" *Monariti v. Berryhill*, 2017 WL 4100030, at *15 (S.D. Tex. Sept. 15, 2017) (quoting *McQueen v. Apfel*, 168 F.3d 152, 157 (5th Cir. 1999)). And here, the record establishes that Miller cannot perform the only available jobs identified by the VE. Remanding for further proceedings would serve no valid purpose. *See, e.g.*, *Walker v. Shalala*, 1994 WL 171209, *2 (S.D. Tex. Jan. 6, 1994) (declining open-ended remand that "would simply delay receipt of benefits" (citing *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992))). The proper remedy is to direct the Commissioner to award Miller's requested disability benefits. *See Cruz v. Colvin*, 2016 WL 8672925, at *3-4 (S.D. Tex. Dec. 28, 2016) (same disposition where VE's

18

testimony indicated that claimant could not perform the listed jobs), *adopted by* 2017 WL 1274296 (S.D. Tex. Jan. 27, 2017).

## Conclusion

For the foregoing reasons, and pursuant to the fourth sentence of 42 U.S.C. § 405(g), it is **ORDERED** that the Social Security Administration's determination is **REVERSED**.  It is further **ORDERED** that this case is **REMANDED** to the Commissioner for an immediate award of benefits.

Signed on March 12, 2024, at Houston, Texas.

_____
Yvonne Y. Ho
United States Magistrate Judge